IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:21-cr-20213-MSN |
| ) | |
| COURTNEY MILLER, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS
PHOTOSPREAD IDENTIFICATION OF DEFENDANT**

Before the Court is Defendant Courtney Miller's Motion to Suppress Photospread Identification of Defendant, filed March 23, 2022. (ECF No. 72.) District Judge Mark S. Norris referred the motion to the undersigned for report and recommendation. (ECF No. 75.) The United States responded in opposition on April 5, 2022. (ECF No. 79.)

The Court held a hearing on the motion on April 22, 2022. (ECF No. 85.) At the hearing, the United States called one witness, Lieutenant James McDonald, and introduced into evidence three exhibits: a Memphis Police Department Advice to Witness Viewing Photographic Display form, dated October 26, 2020, and signed by Jeremy Rice-Stampley (Exhibit 1); the photographic display at issue (Exhibit 2); and a disc containing video surveillance footage (Exhibit 3). Miller did not call any witnesses and introduced one exhibit: a copy of the photographic display with names and dates of birth associated with each image (Exhibit 4).

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, this Court recommends that the motion be denied.

## PROPOSED FINDINGS OF FACT

The following proposed facts are taken from the sworn testimony presented at the suppression hearing. Where factual conflicts were presented, these facts represent the undersigned's resolution of those conflicts after considering the credibility of the witness and supporting evidence.

Lieutenant McDonald was, at the time of the incident in question, a Memphis Police Department sergeant with the FBI Safe Streets Task Force, tasked with investigating, among other things, Hobbs Act robberies. (Tr. 3.) He was assigned to the task force in October 2017. (*Id.* at 6.) In October 2020, McDonald was investigating a robbery that had occurred at a Family Dollar on Airways Boulevard in Memphis, Tennessee. (*Id.* at 3–4.)

The United States introduced video surveillance footage of the incident, cut together sequentially from multiple cameras at the Family Dollar (Exhibit 3). (*Id.* at 18–19.) The video, date-stamped October 16, 2020, shows two Black males walk into the Family Dollar, the first (identified by McDonald as co-defendant Moss) wearing a gray sweatshirt, a gray knit cap, and a black face mask, and the second (identified by McDonald as Miller) wearing a light pink or white hooded sweatshirt and a light blue disposable-style face mask, with fairly short hair. (*Id.* at 20.) The two men walk through the store and approach the register, where the cashier, identified as Jeremy Rice-Stampley, is assisting another customer. When that customer walks away, the man in gray appears to initiate a transaction, handing Rice-Stampley an item for purchase, which Rice-Stampley rings up, places in a bag, and hands back to the man. When

Rice-Stampley opens the register drawer, the man in gray leans forward and displays a handgun. The man in the light-colored sweatshirt is standing to the left of the man in gray, then walks to stand behind him to his right, and then walks to the front door of the Family Dollar, where he waits with his hand on the door handle while looking back in the direction of the register. Rice-Stampley is seen pulling cash from the drawer and handing it to the man in gray, who leaves the Family Dollar with the man in the hooded sweatshirt. The video is three minutes and nine seconds long, but because it contains overlapping footage of the same activity from multiple angles, it is evident that the duration of the actual incident was shorter, likely no more than two minutes.

McDonald interviewed Rice-Stampley after the incident. (*Id.* at 20.) Rice-Stampley initially described the man without the firearm as a mid-twenties Black male wearing a pink hoodie. (*Id.* at 21.) He did not know either perpetrator and had not seen them before. (*Id.* at 24.) Rice-Stampley described the firearm as a long black firearm with a long barrel and an orange sight like the Joker used in the Batman movie. (*Id.* at 21.)

The robbery appeared to be a part of a string of four robberies, and once two suspects were arrested in connection with the investigation, McDonald assumed responsibility for all four cases. (*Id.* at 3–4.) The connection among the four robberies was the car used by the perpetrators. (*Id.* at 22.) A witness to the first robbery described the perpetrators' car as a gray Nissan Altima or Maxima with temporary tags and was able to provide officers the tag number. (*Id.*) In the second incident, a robbery of a Mapco, the perpetrators pulled to the front of the business in what was readily identifiable as the same vehicle. (*Id.*) In the third robbery, the same vehicle was seen in surveillance video. (*Id.*) The fourth and final robbery occurred in Jackson, Tennessee, when Miller and his co-defendant, Moss, were arrested by Tennessee

Highway Patrol. (*Id.* at 21.) The arrest occurred after a high-speed pursuit, which ended when the defendants crashed their vehicle—the same make and model car identified as the one used in the three prior crimes with the same temporary tag number as identified in the first crime. (*Id.*) A firearm was recovered in the search of the vehicle—a long black revolver with a long barrel and an orange sight. (*Id.*) McDonald testified that the recovered firearm was exactly like Rice-Stampley's description of the firearm used in the Family Dollar robbery. (*Id.* at 22.)

Following the arrest, McDonald decided to conduct a photographic lineup to see if a witness could identify Moss and Miller. (*Id.* at 4.) During the time McDonald was assigned to the task force, and as part of his duties in his prior assignment to the General Investigations Bureau at his precinct, McDonald conducted dozens of photographic lineups. (*Id.* at 6.) To create the lineup at issue, McDonald used the Shelby County Sheriff's Mugshot program, which uses booking photographs to generate lineups. (*Id.* at 5.) He entered Miller's name into the program, and the program pulled up any booking photographs associated with that name. (*Id.*) McDonald then selected the photograph of Miller that most closely resembled him at the time of the incident, and the program pulled booking photographs of other individuals similar to Miller's. (*Id.*) McDonald did not know how the program selected the other pictures to suggest for inclusion in the lineup, but he explained that the program returned hundreds of results that he was able to select from. (*Id.* at 37–38.)

McDonald then scrolled through the results and selected the photographs he deemed most similar to Miller's photograph. (*Id.* at 5.) In doing so, McDonald tried to find the photographs that most closely matched Miller's, focusing on skin tone, complexion, hair style, facial hair, the size and shape of his head, eye shape, and the presence of glasses, earrings, or tattoos. (*Id.* at 5, 16.) McDonald also testified that he would look at whether the suspect had tilted his head or

4

turned it a particular way. (*Id.* at 16.) McDonald did not want photographs of individuals who appeared noticeably older or younger than the suspect, but he believed that a few years age variation did not make much difference. (*Id.*) McDonald testified that it is extremely difficult to find photographs of individuals with the exact same appearance as the suspect, and the goal is to match the suspect as close as possible, focusing on major features. (*Id.* at 35.) Once McDonald selected the five photographs to add to Miller's to create the lineup, the program printed two copies of the lineup: one with only the photographs to be shown to the witness (Exhibit 2), and one with names and birthdates associated with each photograph, which is not shown to the witness (Exhibit 4). (*Id.* at 5–6.)

The photographic lineup displays six photographs. All six images are the same size and have a red tint. All six are of Black males with short hair and short mustaches. In each the face occupies almost the entire length of the photograph, and the heads are similarly sized and oriented. The widths of the faces vary, with Image 5 depicting the widest and Image 3 the narrowest. The background pattern of each photograph appears the same—horizontal black lines described by McDonald as height markers, though the numbers that would indicate height are not visible in the photographs. (*Id.* at 36.) Image 1 is the lightest photograph, with the face more illuminated and the background mostly white. The faces in Images 2, 4, and 5 are less illuminated than Image 1. The background of Image 2 is slightly redder than Image 1 and less red than Images 4 and 5. Images 3 and 6 are the darkest with a darker red background. The individual in Image 6 is either the darkest complected or the least illuminated. The individuals in Images 1, 4, 5, and 6 are looking straight into the camera, whereas the individual in Image 2 either has his eyes closed or is looking down such that his eyes appear almost completely closed, and the individual in Image 3 is looking down and to his right, though his eyes are still visible.

The copy of the lineup with identifying information reveals that Image 1 is Terrance Young, born April 23, 1991; Image 2 is Courtney Miller, born March 28, 1995; Image 3 is Jackie Hoskins, born August 22, 1992; Image 4 is Jeremiah Hall, born July 24, 1991; Image 5 is Adrian Davis, born August 23, 1991; and Image 6 is Antony Banks, born November 13, 1992.

      McDonald contacted Rice-Stampley to inform him that a suspect had been identified and asked if he would be willing to view a lineup. (*Id.* at 7.) Rice-Stampley agreed to view the lineup, and McDonald (accompanied by another officer, Sergeant Milton Gonzalez) met him at work at the Family Dollar on October 26, 2020, at around 3:00 p.m.[1] (*Id.* at 12, 25.) Before showing Rice-Stampley the lineup, McDonald went through the Advice form (Exhibit 1) with him. (*Id.* at 12.) McDonald explained that the lineup would contain photographs of individuals with similar features and characteristics, that the photographs would appear in no particular order, that he would not be able to give Rice-Stampley any hints or suggestions, and that Rice-Stampley could cover up portions of the faces or images as he looked at the lineup. (*Id.* at 10.) McDonald told Rice-Stampley that, if he could identify the person he felt was responsible for the incident, he should circle that picture and write a brief explanation of what happened on the page. (*Id.* at 11.) McDonald also told Rice-Stampley that, if he could not identify anyone, he should not circle anything, which was okay, and he did not have to identify anyone if he was not certain. (*Id.*) McDonald testified that, in general, people understand the form and do not have a problem with the process. (*Id.*)

      Rice-Stampley told McDonald that he understood, and Rice-Stampley signed the form. (*Id.* at 12.) McDonald then told him to go back to the day of the incident and focus on what he

---

[1] Another officer conducted a photographic lineup with Rice-Stampley a few days earlier in which he identified Moss as the other perpetrator. (*Id.* at 7.)

6

saw as to the individual without the firearm. (*Id.*) McDonald told Rice-Stampley to focus on the man's facial features and what he remembered and, when he was ready, to turn over the lineup and see if he could identify anyone. (*Id.*) McDonald testified that Rice-Stampley did not have any problem identifying Miller in the lineup. (*Id.* at 14.) Rice-Stampley circled Miller's photograph, wrote at the bottom of the page "Blocked entrance to door so no customers could come in the store as it was being robbed, was the lookout during the whole robbery," and signed his name. (*Id.* at 13.) McDonald then added his initials, employee number, and the time in the bottom right corner of the lineup, and Rice-Stampley filled out the bottom of the Advice form indicating that he had positively identified photograph number 2. (*Id.* at 13, 17.)

## PROPOSED CONCLUSIONS OF LAW

Miller seeks suppression of the pretrial photographic identification as impermissibly suggestive. Though some slight differences exist among the images in the lineup, none of those differences is impermissibly suggestive. Moreover, the totality of the circumstances indicates that the identification is reliable. It is therefore recommended that Miller's motion be denied.

A defendant's right to due process is violated when pretrial identification procedures are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968); *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005) (citing *Stovall v. Denno*, 388 U.S. 293, 301–02 (1967); *Neil v. Biggers*, 409 U.S. 188 (1972)). In determining whether an identification procedure was impermissibly suggestive, courts employ a two-step analysis. *United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992). First, the defendant bears the burden of showing that the procedure was impermissibly suggestive. *Id.* Second, the court determines whether the identification was nonetheless reliable. *Id.* "If an identification is reliable, it will be admissible even if the

7

confrontation was suggestive." *Howard*, 405 F.3d at 469 (citing *Carter v. Bell*, 218 F.3d 581, 605 (6th Cir. 2000)).

"If the defendant fails to show that the identification procedures were impermissibly suggestive, or if the totality of the circumstances indicates that the identification was otherwise reliable, then no due process violation has occurred." *Hill*, 967 F.2d at 230. If "there is not a substantial likelihood of misidentification, it is the function of the jury to determine the ultimate weight to be given to the identification." *Id.* (quoting *United States v. Causey*, 834 F.2d 1277, 1285 (6th Cir. 1987)).

I. **Whether the Photographic Lineup Was Impermissibly Suggestive**

Miller asserts that the lineup was unduly suggestive for a number of reasons. In his brief, Miller argues that his face appears larger, his image is darker, and he is more than two years younger than the other individuals in the lineup. (ECF No. 72, at 4.) At the hearing, Miller also argued that he is the only one in the lineup with his eyes closed and that his background is different from Images 1, 3, and 6. (Tr. 31.) The Court will address each argument.

First, Miller's face is not larger than the faces in the other images. Photographs in an identification array "must be 'substantially similar in size, shape, and pose.'" *United States v. Walden*, 985 F.2d 562, at *2 (6th Cir. 1993) (unpublished table opinion) (quoting *United States v. Tyler*, 714 F.2d 664, 666 (6th Cir. 1983)). Here, the six images are all the same size, and the space each face occupies within the image is very similar. Some difference exists in the width of the faces, but Miller's face falls somewhere in the middle—neither the widest nor the narrowest. There is nothing unduly suggestive about Miller's face size.

Second, the exposure and background color of Miller's image are not impermissibly suggestive. Differences in colors and tones among lineup photographs may render the lineup

impermissible—for example, "including one color photograph of a criminal defendant among a group of black-and-white photographs is unduly suggestive." *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003) (citing *United States v. Crozier*, 259 F.3d 503, 510 (6th Cir. 2001)). However, "[s]tanding alone, minor differences in the exposure and quality of photographs in a pretrial lineup array do not establish that the array was impermissibly suggestive." *Id.* (citing *United States v. L'Allier*, 838 F.2d 234, 240 (7th Cir. 1988)); *see also United States v. McComb*, 249 F. App'x 429, 440 (6th Cir. 2007) ("A darker hue or different colored background does not 'in [itself] create an impermissible suggestion that the defendant is the offender.'") (quoting *United States v. Burdeau*, 168 F.3d 352, 358 (9th Cir. 1999)). Where, for instance, a defendant's photograph had an "overall darker, grayish hue" in contrast to the "yellowish cast" of the other photographs, the lineup was not impermissibly suggestive, even though the defendant's photograph depicted a mugshot marker reading "ID NO." and "DATE," whereas the others did not. *Irorere*, 69 F. App'x at 236. Here, Miller's image is darker than some and lighter than others, though the degree of difference between even the darkest and lightest image is not great. Similarly, the background tint of Miller's image is redder than Image 1 and less red than Images 3, 4, 5, and 6—but only slightly less red than Images 4 and 5. Miller's image is not at the extreme end of either of these spectra of exposure and pigment, and the relatively minor differences in the photographs do not render the lineup impermissibly suggestive.

Third, Miller argues that he is "over 2 years younger in age than the next closest person on the photospread." (ECF No. 72, at 4.) Critically, Miller does not argue that he appears younger in the photographic lineup—and based on this Court's review of Exhibit 2, he does not. Instead, Miller argues he is in fact younger, a fact that was unknown to Rice-Stampley and thus

9

could not have suggested to him that Miller was the perpetrator. *See, e.g.*, *Howard*, 405 F.3d at 470 (finding that courts "look to the effects of the circumstances of the pretrial identification, not whether the enforcement officers intended to prejudice the defendant"). And even if Miller did appear younger than the other individuals, he has not indicated how that age difference would have drawn attention to him. *See, e.g.*, *United States v. Wiggins*, 3:19-cr-00296, 2021 WL 1251851, at *3 (M.D. Tenn. Apr. 5, 2021) ("[B]eing the oldest by no means makes that one the perpetrator rather than merely, well, the oldest."). The age difference between Miller and his comparators is not apparent from the photographic lineup and thus does not render the lineup suggestive.

Finally, the positioning of Miller's eyes is not impermissibly suggestive. As noted above, Miller's failure to look directly into the camera is not unique among the array—Image 3 also features an individual looking away from the camera. To the extent Miller's image is an outlier in that his eyes are the least visible, that difference is minor and does not rise to the level of drawing the witness's attention to Miller. Furthermore, McDonald credibly testified that finding five images identical to Miller's—that is, five images in which the subjects have hair, facial hair, and complexion similar to Miller's *and* have their eyes closed—would be extremely difficult. The photographic lineup in this case contains six images that are very similar in a number of ways, and the few differences highlighted by Miller do not make it improper. *See, e.g.*, *United States v. Peterson*, 411 F. App'x 857, 865 (6th Cir. 2011) ("In light of the many substantial similarities between those in the photo array, the alleged differences in clothing and age are too minor to render the spread unduly suggestive.").

None of the differences in the photographs identified by Miller is suggestive that he was the perpetrator, much less impermissibly suggestive. *See Tyler*, 714 F.2d at 667–68 ("[T]he

10

question before us is not whether this photo array was suggestive, but rather, whether it was *impermissibly suggestive*. Each case must be considered on its own facts."). Miller has not met his burden of establishing that the pretrial identification by Rice-Stampley was unnecessarily or impermissibly suggestive, rendering suppression unavailable.[2]

## II.     Whether the Pretrial Identification Was Otherwise Reliable

Even if Miller had met his burden of demonstrating that the lineup was impermissibly suggestive, the Court finds the identification otherwise reliable. "[R]eliability is the linchpin in determining the admissibility of identification testimony." *Howard*, 405 F.3d at 472 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). To determine whether an identification is reliable, courts consider the totality of the circumstances, including by weighing five factors:

> (1) the opportunity of the witness to view the perpetrator during the crime; (2) the witness's degree of attention to the perpetrator; (3) the accuracy of the witness's prior descriptions of the perpetrator; (4) the level of certainty demonstrated by the witness when identifying the suspect; and (5) the length of time between the crime and the identification.

*Jells v. Mitchell*, 538 F.3d 478, 513 (6th Cir. 2008) (citing *Neil*, 409 U.S. at 199–200). These factors are weighed against the corrupting effect of the suggestive identification. *Id.* (citing *Manson*, 432 U.S. at 114). Each factor indicates the identification in this case is reliable.

As to the first factor, Miller argues Rice-Stampley observed him only briefly and was unfamiliar with him prior to the robbery. The surveillance video introduced by the United States, however, shows that Rice-Stampley interacted with both Moss and Miller and that Miller was standing next to and behind Moss while Moss brandished the firearm at Rice-Stampley.

---

[2] Because the Court determines that Miller did not meet his burden at step one, the Court will not address Miller's argument, made at the hearing, that the United States was required to produce Rice-Stampley to testify as to reliability at step two.

11

Though the encounter was brief, it was neither insignificant nor insufficient for Rice-Stampley to become acquainted with Miller's appearance.  This factor weighs in favor of reliability.

The second factor also weighs in favor of reliability.  "To analyze the sufficiency of an eyewitness's degree of attention, we generally examine the circumstances surrounding the witness's encounter."  *Howard*, 405 F.3d at 473 (citation omitted).

> We find more reliability where a witness was able to view the assailant with a heightened degree of attention, as compared with disinterested bystanders or casual observers.  Generally, we place greater trust in witness identifications made during the commission of a crime because the witness has a reason to pay attention to the perpetrator.

*Id.* (citations and quotations omitted).  Here, Rice-Stampley had every reason to be attentive during his memorable and dangerous encounter with two men at the Family Dollar, one of whom was brandishing a long-barrel revolver.

As to the third factor, Rice-Stampley's prior description of Miller proved accurate.  Miller argues that Rice-Stampley gave only a "vague description" that the lookout had short hair and a dark complexion.  (ECF No. 72, at 4.)  Those characteristics are consistent, however, with Miller's appearance in the photographic lineup.  *See, e.g.*, *Howard*, 405 F.3d at 473 (finding this factor satisfied where the prior description was "sparse" but "not inaccurate").  Rice-Stampley also described Miller as wearing a pink hoodie, which the surveillance video confirms.  This factor also weighs in favor of reliability.

Fourth, though the record contains little evidence regarding Rice-Stampley's certainty in his identification, McDonald credibly testified that Rice-Stampley had no problem identifying Miller from the lineup.  This factor is thus neutral or weighs slightly in favor of the United States.

As to the fifth factor, Miller argues the identification is unreliable because ten days passed between the incident and the photographic lineup. The Sixth Circuit has found, however, that eleven days was "not a significant period of time" between an incident and an identification, *Jells*, 538 F.3d at 513, and even three months was not a "great length of time," *Howard*, 405 F.3d at 474. In light of that precedent, and based on the other indicia of reliability discussed herein, the passage of only ten days between Rice-Stampley's observation of the incident and his selection of Miller from the lineup supports the reliability of his identification.

The totality of the circumstances, including each of the relevant factors, indicates that Rice-Stampley's identification of Miller as the lookout in the Family Dollar robbery is reliable, particularly when considered in light of the photographic lineup's lack of suggestiveness. Accordingly, it is recommended that Miller's request for suppression of the identification be denied.

## **RECOMMENDATION**

For the foregoing reasons, this Court recommends the motion to suppress be denied.

Respectfully submitted this 26th day of April, 2022.

s/Annie T. Christoff<br>
ANNIE T. CHRISTOFF<br>
UNITED STATES MAGISTRATE JUDGE

## **NOTICE**

Within fourteen (14) days after being served with a copy of this report and recommendation, a party may serve and file written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59 (b)(2). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Failure to file objections within fourteen (14) days may constitute waiver of objections, exceptions, and further appeal.