## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| v.  ) | No. 2:21-cr-20213-MSN |
| ) | |
| MICHAEL MOSS,  ) | |
| ) | |
| Defendant.  ) | |

### REPORT AND RECOMMENDATION ON MOTIONS TO SUPPRESS

Before the Court are Defendant Michael Moss's Motion to Suppress Statement (ECF No. 110), Motion to Suppress Identification as to Counts 1 and 2 (ECF No. 111), and Motion to Suppress Identification as to Counts 7 and 8 (ECF No. 112), all filed August 22, 2022. District Judge Mark S. Norris referred the motions to the undersigned for report and recommendation. (ECF No. 113.) The United States responded in opposition to each motion on October 26, 2022. (ECF Nos. 130, 131, 132.)

The Court held a hearing on the motions on March 1, 2023. (ECF No. 152.) At the hearing, the United States called three witnesses, Investigator Joseph Williams, Captain Christopher Chestnut, and Franz Knox, and introduced into evidence one exhibit, the photographic lineup. Moss did not call any witnesses or introduce any exhibits.

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibit, and the entire record in this case, this Court recommends that the motions be denied.

**PROPOSED FINDINGS OF FACT**

The following proposed facts are taken from the sworn testimony presented at the suppression hearing. Where factual conflicts were presented, these facts represent the undersigned's resolution of those conflicts after considering the credibility of the witness and supporting evidence.

On October 16, 2020, two men allegedly robbed a Family Dollar store on Airways Boulevard in Memphis, Tennessee, at gunpoint. A witness, Jeremy Rice-Stampley, was shown a photographic lineup on October 23, 2020, by law enforcement. (Exhibit 1.) Rice-Stampley identified Moss as the gunman.

On October 23, 2020, Franz Knox was working at the Advance Auto Parts at 2124 N. Highland Avenue in Jackson, Tennessee. Knox has been employed at the Advance Auto Parts for ten years and is a manager. Other employees in the store that day where Fred Fitzgerald (a delivery driver) and Knox's manager who had opened the store. That morning, Knox was on the telephone when a customer came in and walked out, and then returned with another individual. Knox was standing behind a counter with plastic Covid dividers as the men passed in front of him. Knox testified that he described the man he later identified as Moss to the officers as having dreads hanging down to his shoulder, a Covid mask, a tattoo on his neck, and sagging khaki pants. Knox testified that he is not a big fan of people wearing the pants sagging, so he noticed the pants first. The man walked in holding his pants up, with his right arm swinging. He was 5'5" or 5'6". Though the man had a mask on, Knox caught his eyes. Knox could see his eyes and felt that he did not look like a regular customer coming in the store. Knox testified that there was something about the customer when he came in the store that did not feel right.

Knox acknowledged the two men and stayed on the telephone. When Knox turned to see where the individuals had gone, he saw that one of the men, later identified as Moss, had come behind the counter and had a revolver in his hand. Knox described the firearm as black and with a silencer. Knox laid the telephone down; the customer he was talking to heard that the robbery was occurring and called the police.

The man with the gun pointed it at Fitzgerald and told him to open the cash register or someone would be shot. Fitzgerald, as a driver, could not open the register. The only way to open the register is to ring something up, so Knox entered a transaction and opened it. The man with the gun told his companion to get the hundreds out of the register. The man with the gun saw the safe, which is right behind the register, and told Fitzgerald to open it. Fitzgerald does not know the combination to the safe, so Knox opened the safe. During the robbery, Knox's manager was in the back in the restroom, and Knox was worried that he would come out and startle the robbers. After opening the safe, Knox backed up with his hands up. The safe had a metal box with petty cash and some bank bags. The man with the gun told the other man to get the money out of the safe. They took the metal box and the two bags and ran out of the store. Fitzgerald went to the window to see the make and color of their vehicle, and then they called 911.

Captain Christopher Chestnut responded to the robbery at the Advance Auto Parts. Captain Chestnut has been employed with the Jackson Police Department for more than thirty years and is responsible for the Major Crimes Division, which investigates violent crimes, including aggravated robberies, aggravated assaults, and attempted murders. Captain Chestnut spoke to Knox and Fitzgerald, who gave him a description of the suspects. They described one of the suspects as having braids or dreads. Captain Chestnut testified that Knox told him the

3

firearm was a large revolver.  The employees indicated that the suspects had fled in a vehicle, which Captain Chestnut remembered being described a gray Honda or something similar and said that it was traveling northbound on Highland toward Interstate 40.  Captain Chestnut learned from dispatch that Tennessee Highway Patrol had been in pursuit of a vehicle matching that description, and the vehicle had crashed.  Knox told Captain Chestnut that he believed that if he saw the individual again, he could identify him.

At 10:45 a.m., Investigator Joseph Williams arrived at the Advance Auto Parts and was briefed on the robbery by Captain Chestnut, his supervisor.  Investigator Williams is assigned to the Major Crimes Unit and has been with the Jackson Police Department for fifteen years.  Investigator Williams testified that Captain Chestnut told him that two Black males had perpetrated the robbery and then fled in a silver Nissan, going north on Highland towards Interstate 40.  Captain Chestnut also told him that Tennessee Highway Patrol had been in pursuit of a silver Nissan Maxima and had detained two suspects after the vehicle crashed at mile marker 27 on Interstate 40.  Captain Chestnut told him that Knox believed he would recognize the suspects if he saw them again, and Captain Chestnut instructed that they would take Knox to the crash scene to conduct a "show-up."

Investigator Williams testified that his supervisor advised him that they were going to do a show-up, which are regularly done if individuals are detained immediately after a crime is committed, to make an identification and inform the officers' decision whether to detain the suspect.  If the witness is unable to identify the suspect, no charges are typically brought.  Captain Chestnut testified that he made the call on the scene to do a show-up, rather than do a photographic lineup later, because it was the quickest way to get the identification and because he felt more comfortable having Knox make the identification before the suspects were

transported back to Jackson. Captain Chestnut testified that property from the robbery had been found in the crashed vehicle, so he did not think the suspects found in that vehicle were random people unrelated to the robbery.

The officers told Knox they were going to take him to do a show-up, to see if he could identify the suspect. The three men traveled to the crash scene in Captain Chestnut's Chevy Tahoe, with Captain Chestnut driving, Knox in the front passenger seat, and Investigator Williams in the backseat. Investigator Williams testified that, during the drive, Knox briefly told the officers about what had happened during the robbery—that two men had come into the store, one walked behind the counter with a firearm, while the other set something on the counter, they demanded money from the safe and register, he gave them the money, they fled from the store, and they drove off in the silver Nissan. Knox testified that, during the drive, no one told him any information about the individual he would be attempting to identify. The drive to the location of the crash took about thirty to forty-five minutes.

The officers learned that the Nissan had clipped a semi-truck and crashed into a guardrail on the right side of the interstate. When they arrived at the scene, there was debris in the roadway, multiple Trooper vehicles, an ambulance and EMS personnel, a fire truck, the wrecked Nissan, and the semi-truck the Nissan had hit. Most of the interstate was blocked off; traffic was being run in the left emergency lane. Captain Chestnut pulled his Tahoe up behind the Trooper vehicles as close and as far to the right as he could, parking partially in the right lane and partially in the emergency lane. Captain Chestnut testified that he parked the Tahoe approximately four or five car lengths back (or perhaps the length of two to three Tahoes) from the patrol car where Moss was being held; Investigator Williams testified that the distance was three to four vehicle lengths; Knox testified that the distance was approximately fifty yards.

Several Trooper vehicles (either sedans or SUVs) were actually between the Tahoe and the patrol car holding Moss.

Knox initially stayed in the Tahoe. Investigator Williams testified that he got out of the Tahoe to talk to the Troopers while Captain Chestnut stayed in the Tahoe with Knox; Captain Chestnut testified that both he and Investigator Williams got out of the Tahoe. Investigator Williams spoke with a Trooper who told him the two detained individuals were Moss and Courtney Miller, and the Trooper transferred to Williams items collected from the Nissan, including a .45 Taurus long-barrel revolver, approximately $890, multiple packs of Newports, and two bank bags. The robbery of the Advance Auto Parts netted $1,600. Knox testified that Investigator Williams collected evidence from the Troopers and brought the evidence back to the Tahoe, including the firearm he said was involved in the robbery. Knox saw the firearm that Investigator Williams had collected and recognized it as the same firearm he saw during the robbery.

Miller was in the back of the ambulance and thus unable to participate in a show-up, but Moss was in the back of a Trooper vehicle. Investigator Williams told the Troopers that they wanted to do a show-up on Moss. Captain Chestnut returned to the Tahoe and told Knox that they were about to have someone step out of the patrol car who may or may not be someone who was involved in the robbery and to tell him if Knox recognized anything about him. Investigator Williams stayed with the Troopers during the show-up, while Captain Chestnut was with Knox.

Investigator Williams testified that, to his knowledge, Knox never got out of the Tahoe; Captain Chestnut similarly testified that Knox viewed Moss from inside the Tahoe and never got out. Knox testified, however, that Captain Chestnut came back to the Tahoe and told Knox that they were going to take the suspect out of a car and asked him to move closer to identify him.

6

Knox could not see Moss from where he sat in the Tahoe because of the distance and other vehicles in the way. Knox got out of the Tahoe and advanced to about fifty yards from the vehicle holding Moss. Then, when the officers were ready to get Moss out of the vehicle, Knox moved up another thirty yards, such that he was about twenty yards, or approximately the distance from the witness stand to the back of the courtroom, from Moss. Captain Chestnut similarly testified that, when Knox identified Moss, the distance between the two men was approximately the distance of the witness stand to the back of the courtroom.

      A Trooper pulled Moss out of the back of the passenger side of the patrol car, on the shoulder of the interstate, and had him step out a couple of feet and turn back to face Knox. Moss stood there for ten to fifteen seconds and was then placed back in the patrol car. Investigator Williams could not recall if Moss was handcuffed but agreed that it would be standard procedure to have him handcuffed. Captain Chestnut testified that he could see Moss's whole person from where he was, including his hair and his boxer shorts.

      Captain Chestnut testified that, when Moss got out of the patrol car, Knox immediately said, "that's him, that's the guy with the gun." Chestnut asked him if he was sure, and Knox said he was 100% sure. Knox testified that he was able to identify Moss because of his hair and his sagging pants; he was wearing the same clothes as he had worn at the Advance Auto Parts. He could not see his face, but he could still identify him. Captain Chestnut testified that Knox identified Moss's hair, face, and clothing as resembling the suspect, including some bright fluorescent (orange, green, or yellow) boxer shorts that were sticking out of Moss's pants. Knox had previously described the boxer shorts at the scene of the robbery.

      Captain Chestnut then informed Investigator Williams that Knox had positively identified Moss as a participant in the robbery at the Advance Auto Parts. Knox testified that they were at

7

the crash scene approximately twenty or thirty minutes. The officers took Knox to get something to eat and then took him back to Jackson. Moss was then taken to the Jackson Criminal Justice Complex.

Knox testified initially that he thought the officers showed him a picture of Miller, and told him Miller's name, as they were driving to the crash scene, but he later testified that they showed him the picture of Miller, and one of Moss, on the drive back to Jackson from the scene. Knox also testified that, a few days after the robbery, Fitzgerald pulled up images of Moss and Miller from a Memphis Most Wanted website and showed them to Knox. Knox further testified that he has identified Moss and Miller in a court proceeding in Jackson.

## PROPOSED CONCLUSIONS OF LAW

### I. Suppression of Statements

In his Motion to Suppress Statement, Moss seeks suppression of statements he made to officers following his arrest on October 23, 2020. Though Moss initially waived his rights and agreed to speak with officers, he thereafter invoked his right to remain silent. Moss requests suppression of any statements made after that invocation. In its Response, the United States indicate that Moss made no inculpatory statements following that subsequent invocation. At the hearing, the United States confirmed that it would not attempt to offer any statements made by Moss after he invoked his right to counsel or his statements invoking that right themselves. It is therefore recommended that this motion be denied as moot.

### II. Suppression of Photographic Identification

Moss seeks suppression of the pretrial photographic identification made after the Family Dollar robbery. A defendant's right to due process is violated when pretrial identification procedures are "so impermissibly suggestive as to give rise to a very substantial likelihood of

irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968); *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005) (citing *Stovall v. Denno*, 388 U.S. 293, 301–02 (1967); *Neil v. Biggers*, 409 U.S. 188 (1972)). Moss bears the burden of showing that the procedure was impermissibly suggestive. *United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992).[1]

Moss argues that, because his is the only photograph of a person with a neck tattoo, the lineup was impermissibly suggestive. The United States responds that the neck tattoo in Moss's photograph is not clearly identifiable and could be seen as discoloration (razor burn or scarring) on his neck, and that two of the other images (Photos 1 and 5) have similar discoloration. The United States argues that the six photographs are otherwise similar, depicting Black men in the same age range with similar complexions, face shapes, and hair.

The lineup presented as Exhibit 1 is not impermissibly suggestive. It presents six Black men of similar age and hair styles, and the photographs are similarly sized with identical backgrounds. The image of Moss, Photo 3, does depict dark coloration on Moss's neck consistent with his neck tattoo, but the tattoo is not clearly visible in the photograph and could easily be mistaken for another type of marking, such as shadow or scarring. Indeed, the other five photographs in the lineup all show some amount of darkening or shadow on the necks of the individuals depicted therein. "[W]here photographs of individuals included in a lineup share physical characteristics with that of a suspect, the lineup is not 'grossly dissimilar,' and is not

---

[1] At the hearing, the United States relied exclusively on the permissibility of the lineup itself, arguing Moss has not met his burden, and opted against introducing evidence to show that the identification was nonetheless reliable under the second step of the analysis. *See id.*; *Davis v. McCullick*, No. 19-12207, 2022 WL 1289307, at *6 (E.D. Mich. Apr. 29, 2022) ("It is only after a defendant meets that burden that the court must require the state to prove that the identification was reliable, independent of the suggestive identification procedure." (citing *United States v. Wade*, 388 U.S. 218, 240 n.31 (1967))).

9

unduly suggestive." *United States v. Sturgis*, No. 21-20558, 2022 WL 4299358, at *2 (E.D. Mich. Sept. 19, 2022) (quoting *Wade*, 388 U.S. at 233; citing, e.g., *United States v. Watson*, 540 F. App'x 512, 516 (6th Cir. 2013)). "[T]he police are not required to conduct a search for identical twins in age, height, weight or facial features." *Id.* (quoting *Hutsell v. Sayre*, 5 F.3d 996, 1005 (6th Cir. 1993)); *see also United States v. Mahler*, No. 1:13-CR-00123, 2014 WL 495631, at *9 (D. Idaho Feb. 6, 2014) ("The fact that the Defendant's photograph is the only one in the lineup with tattoos showing is not unnecessarily suggestive given how minimally the tattoos are showing and the fact that all of the six photographs in the series included the other features as described by [the witness]."). The minor differences in neck discoloration between Moss's photograph and the other photographs in the lineup do not render the lineup impermissibly suggestive. It is therefore recommended that Moss's motion be denied.

### III.   Suppression of Show-Up Identification

Moss argues that the show-up identification should be suppressed as impermissibly suggestive. As discussed above, a defendant's right to due process is violated when pretrial identification procedures are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384; *Howard*, 405 F.3d at 469 (citing *Stovall*, 388 U.S. at 301–02; *Neil*, 409 U.S. 188). In determining whether an identification procedure was impermissibly suggestive, courts employ a two-step analysis. *Hill*, 967 F.2d at 230. First, the defendant bears the burden of showing that the procedure was impermissibly suggestive. *Id.* Second, the court determines whether the identification was nonetheless reliable. *Id.*

"If an identification is reliable, it will be admissible even if the confrontation was suggestive." *Howard*, 405 F.3d at 469 (citing *Carter v. Bell*, 218 F.3d 581, 605 (6th Cir. 2000)).

"If the defendant fails to show that the identification procedures were impermissibly suggestive, or if the totality of the circumstances indicates that the identification was otherwise reliable, then no due process violation has occurred." *Hill*, 967 F.2d at 230. If "there is not a substantial likelihood of misidentification, it is the function of the jury to determine the ultimate weight to be given to the identification." *Id.* (quoting *United States v. Causey*, 834 F.2d 1277, 1285 (6th Cir. 1987)).

The Sixth Circuit has held that "on-the-scene show-ups are not always unnecessarily suggestive." *United States v. Williams*, 858 F. App'x 827, 830 (6th Cir. 2021) (citing *United States v. Craig*, 198 F. App'x 459, 467 (6th Cir. 2006); *Stidham v. Wingo*, 482 F.2d 817, 818–19 (6th Cir. 1973)); *see also Neil*, 409 U.S. at 198–99 (finding that "the admission of evidence of a showup without more does not violate due process" and refusing to apply the exclusionary rule because the identification was reliable based on the totality of the circumstances). "[C]onducting a showup is consistent with legitimate law enforcement purposes, such as allowing identification before the suspect has had the opportunity to alter his appearance and permitting the quick release of innocent persons." *Drew v. Parker*, 244 F. App'x 23, at 28 (6th Cir. 2007) (citations omitted).

Here, the officers quickly asked Knox if he felt he would be able to identify the robber if he saw him again, and they immediately transported Knox to Moss's location when he said that he could. The fact that Knox observed the silver Nissan and the revolver used in the robbery at the crash scene before the show-up, and saw Moss being pulled out of the back of a patrol car to conduct the show-up, does indicate that the show-up was suggestive, but not unnecessarily so. The fast-moving nature of the inquiry, with Moss being detained so quickly after the robbery, led the officers to take Knox to the crash scene to make the identification where he was necessarily

11

exposed to various aspects of the investigation. Furthermore, Captain Chestnut testified that he made the call on the scene to conduct a show-up identification of Moss, rather than a later photographic lineup identification, because the evidence found in the Nissan suggested Moss's connection to the robbery and because it was the quickest way to get an identification of Moss before he was charged. That testimony reflects a legitimate law enforcement purpose.

Even if the show-up were unnecessarily suggestive, the identification is reliable under the totality of the circumstances and should not be suppressed. To determine whether an identification is reliable, courts consider the totality of the circumstances, including by weighing five factors:

> (1) the opportunity of the witness to view the perpetrator during the crime; (2) the witness's degree of attention to the perpetrator; (3) the accuracy of the witness's prior descriptions of the perpetrator; (4) the level of certainty demonstrated by the witness when identifying the suspect; and (5) the length of time between the crime and the identification.

*Jells v. Mitchell*, 538 F.3d 478, 513 (6th Cir. 2008) (citing *Neil*, 409 U.S. at 199–200). These factors are weighed against the corrupting effect of the suggestive identification. *Id.* (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

Here, each of these factors supports the reliability of Knox's identification of Moss. Knox had plenty of opportunity to observe Moss during the robbery, as Moss was behind the counter next to Knox throughout the encounter. Knox testified that he took note of Moss as soon as he entered the Advance Auto Parts because something about him did not "feel right" and Moss "did not look like a regular customer." Captain Chestnut confirmed that the description Knox provided of Moss before they left the store—including his braided hair and his bright boxer shorts—matched up with Moss's appearance when Knox identified him at the crash scene. Both Knox and Captain Chestnut testified to Knox's certainty in his identification, with Captain

Chestnut testifying that Knox said he was 100% sure that Moss was the person who had robbed the Advance Auto Parts.  Finally, though the full length of time that passed is not entirely clear from the testimony, it is apparent that the show-up occurred within two or three hours of the robbery.  Even if the show-up is deemed to have some suggestive elements, the weight of these factors in comparison to any suggestiveness demonstrates that the identification in this case is reliable.  As such, it is recommended that the motion to suppress the identification be denied.

## **RECOMMENDATION**

For the foregoing reasons, this Court recommends the Motion to Suppress Statement be denied as moot and that the Motions to Suppress Identification be denied.

Respectfully submitted this 4th day of April, 2023.

s/Annie T. Christoff  
ANNIE T. CHRISTOFF  
UNITED STATES MAGISTRATE JUDGE

## **NOTICE**

Within fourteen (14) days after being served with a copy of this report and recommendation, a party may serve and file written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59 (b)(2).  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Failure to file objections within fourteen (14) days may constitute waiver of objections, exceptions, and further appeal.